**L. V. HAIRE, Petitioner,**

v.

**Robert SARVER, Commissioner of Corrections, State of Arkansas, Respondent.**

**No. PB-69-C-31.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Oct. 27, 1969.

**1196**

Philip S. Anderson, Little Rock, Ark., for petitioner.

Joe Purcell, Atty. Gen. of Arkansas, and Mike Wilson, Asst. Atty. Gen. of Arkansas, Little Rock, Ark., for respondent.

## Memorandum Opinion

HENLEY, District Judge.

In October 1967 L. V. Haire, a Negro resident of Pulaski County, Arkansas, was found guilty of second degree murder of a Negro youth, Freddie Lee Jackson, by a jury in the Circuit Court of Pulaski County. He received a sentence of 21 years in the Penitentiary where he is now confined. The Supreme Court of Arkansas affirmed the conviction. Haire v. State, 245 Ark. 289, 432 S.W.2d 828.

Two federal constitutional questions were presented to the Arkansas courts and resolved adversely to Haire. Those questions were: (1) Whether certain statements made by Haire while in custody and before he had been given any Miranda[1] warnings were properly received in evidence, and (2) whether certain evidence admitted at the trial constituted the fruits of an unlawful search and seizure of Haire's house.

On April 8, 1969, Haire tendered to this Court a petition for a writ of habeas corpus; the Court permitted the petition to be filed and prosecuted in forma pauperis but limited its scope to the two questions above mentioned.

The Court initially considered the transcript of Haire's trial in the Circuit Court. After considering that transcript the Court appointed Mr. Philip S. Anderson of the Little Rock Bar to represent petitioner. The Court desires to express its appreciation to Mr. Anderson for his services and also to commend Mr. Mike Wilson, Assistant Attorney General of the State of Arkansas, counsel for respondent, for his candor and cooperation in the presentation of the case.

Freddie Lee Jackson disappeared from his mother's home in Little Rock on the afternoon of May 5, 1967; his disappearance was reported to the Sheriff's office by his mother around noon on Sunday, May 7. All the information that the mother could give the officers was that her son had left the house in the company of a woman known to the mother only as "Jean."

Initial investigation identified "Jean" as being the wife of petitioner. She was taken into custody and seems promptly to have admitted to the investigating officers, two Negro deputy sheriffs, that Jackson had been murdered in the Sweet Home Bottoms in the southeastern part of Pulaski County, and that she and her husband had committed the crime.

While the wife was being questioned Haire appeared voluntarily at the Pulaski County Jail and was immediately arrested. He was not questioned at the time and was not warned as to his rights to remain silent and to have the assistance of counsel.

Petitioner's wife advised the officers that the body of Jackson could be found on the right hand side of a country road running through a field of tall wheat. She was taken to the area by the officers who searched on that side of the road without success.

When the body was not found, Haire was brought from the jail to the scene of the search by other officers. In his presence his wife was asked whether she had not told the officers that the body was on the right hand side of the road. Without waiting for her to reply Haire said, "No, Honey, on the left side." The wife was then asked where the gun was hidden, and she replied that it was un-

---

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

der the bed at the Haire home. Again Haire voluntarily stated that the gun was hidden in the stove or fireplace. When those statements were made, Haire still had not been given *Miranda* warnings.

Subsequently, Haire's house was searched; a .22 calibre pistol was found where he had said that the gun would be found. The officers also found and seized certain other evidentiary material.

When Haire made the statements that have been mentioned it was late in the afternoon or early in the evening of May 7. Darkness was approaching, and the search was discontinued for the night. On the morning of May 8 officers returned to the area, directed their attention to the left hand side of the road, and found the body without difficulty. Jackson had been shot a number of times with a .22 calibre firearm.

At the trial of petitioner officers were permitted to testify over objection as to the statements made by Haire. The Court also received in evidence the gun taken from Haire's house and a pair of muddy shoes likewise taken from the house. Expert witnesses testified that the bullets taken from Jackson's body had been fired from the Haire gun and that the mud on the shoes matched closely the soil samples taken from the place where the body was found.

There was other evidence tending to show motive and to place Jackson in the company of Haire and his wife on the evening and during the night of May 5; there was also evidence to the effect that Haire's wife tried to obtain .22 calibre ammunition on May 5, and that Haire later bought a box of .22 calibre shells from a rural merchant in Pulaski County.

The evidence suggests that during the early stages of the investigation the officers were interested primarily in Haire's wife rather than in Haire himself, and it is not clear why she was not charged. Haire has never admitted that he fired the shots that killed Jackson.

However, there was substantial evidence from which a jury could have found that Haire either killed Jackson or actively participated in the murder. It is to be observed that while Haire was charged with first degree murder, he was convicted of second degree murder only.

■ In passing upon the constitutional questions presented by instant petition the Court exercises its own independent judgment. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. The Court has considered the transcript of the proceedings in the Circuit Court, the opinion of the Supreme Court of Arkansas, and the written stipulation of counsel relative to the search of Haire's house. The Court does not consider that an evidentiary hearing in this Court would serve any useful purpose.

## I.

■ The claim that the testimony relative to Haire's statements was improperly admitted gives the Court no trouble. The Court agrees with the Supreme Court of Arkansas that the statements were spontaneous and voluntary, and that the testimony about them was admissible notwithstanding the fact that when they were made Haire had not been warned of his rights. Miranda v. Arizona, supra, 384 U.S. at 478, 86 S.Ct. 1602.

## II.

The question of the legality of the search or searches of the Haire home is a much more serious one both from a substantive and procedural standpoint, particularly in view of the fact that there is information before this Court in this proceeding that was not brought to the attention of either the Circuit Court or the Supreme Court of Arkansas.

The search of the house and the seizure of the gun, the shoes, and certain other material were purportedly based on a search warrant; and the Circuit Court and the Arkansas Supreme Court both assumed that such a warrant had been issued. However, neither the sup-

posed warrant nor the affidavit upon which it was supposed to have been issued was put in evidence or included in the case file.

In dealing with the question of the legality of the search the Arkansas Supreme Court based its holding on the presumed validity of the warrant and on the fact that the question of unlawful search was not properly presented to the trial court. Cf. Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408.

In Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, the Supreme Court recognized that a defendant in a State court may validly waive a federally protected right but pointed out that the question of waiver is a federal question to be answered in the last analysis by the federal courts if the defendant seeks relief by way of federal habeas corpus.

■ To the extent that the Supreme Court of Arkansas upheld the search here involved on the basis of waiver this Court finds itself unable to accept the holding of the Arkansas Court. It is true that no motion to suppress evidence was filed in advance of the trial, but Arkansas does not require the filing of such a motion. It is also true that the objection to the introduction of the fruits of the search was informal, and, indeed, was noted and overruled by the Circuit Court with exceptions saved before counsel for the defendant had fully expressed his objection. But, the point was raised and preserved, and it was specifically brought home to the trial judge that counsel's position was that the search had antedated the warrant. Of course, if that were true, the warrant was a nullity.

In going over the transcript the Court noted that it did not include a copy of any search warrant or of an affidavit for such a warrant, and the testimony about the warrant was extremely indefinite, as was the testimony about the date of the search.

This Court does not lack familiarity with Arkansas constitutional and statutory provisions relating to search warrants and the procedure for their issuance. And the Court has some familiarity with Arkansas criminal investigative procedures.

■ Article 2, section 15 of the Arkansas Constitution of 1874 is identical in language to the Fourth Amendment to the Constitution of the United States. The issuance of search warrants is governed by statute in Arkansas, and there are a number of statutes providing for search warrants for contraband, stolen property, gambling equipment, and the like. Other statutes permit search warrants to be issued so that officers may search for evidence of certain specified crimes. However, Arkansas, as far as the Court knows, has no statute authorizing general evidentiary searches, and specifically the Court does not know of any Arkansas statute that would authorize a search for a murder weapon as such.

At least until very recently it was rare for Arkansas peace officers to obtain search warrants except in limited types of cases. That was due in part to the strictness of the Arkansas statutes, and it was also due to the fact that prior to the opinion of the Supreme Court of the United States in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, the rule in Arkansas was that evidence was not inadmissible merely because it was unlawfully obtained. See e. g. Woodson v. State, 176 Ark. 153, 2 S.W.2d 1108; Milton v. City of Fort Smith, 175 Ark. 694, 1 S.W.2d 45.

Many officers simply felt that they did not need warrants to search for evidence of crime and proceeded to search without them. At times officers relied on purported consents to search, or considered that their searches were incidental to the lawful arrests of suspects.

■ It is well established in Arkansas that the issuance of a search warrant is a judicial act, and such a warrant must be issued by a judge of a court of record, a justice of the peace, a mayor; and if a search warrant is to be issued, one of those officers must be contacted for that purpose.

Examining the transcript of Haire's trial with those considerations in mind, it appeared to the Court unlikely that the deputy sheriffs investigating the case would have gone to the trouble of obtaining a search warrant during the evening or night of a Sunday, assuming that they could have obtained a warrant valid under Arkansas law; and it also appeared unlikely to the Court that they would have let the night pass with the murder weapon left unguarded in the home of the suspects whence it might be removed by friends or relatives.

One of the deputy sheriffs made no mention of any warrant and could not recall the day of the week on which the search was made. Another deputy said that a warrant was obtained through the Prosecuting Attorney's office. On direct examination he did not recall the day of the search; on cross examination he said that it was made on Sunday, May 7; on redirect he repeated his original testimony to the effect that he did not recall the day on which the search was made.

In view of the state of the record, the Court requested counsel on both sides to try to find out more about the supposed warrant, and to try to stipulate in that connection. They did so, and their stipulation is now of record.

According to the stipulation, neither the warrant nor the affidavit therefor can be located, nor can the judge or magistrate who issued it be identified. The only evidence that there ever was a warrant is a notation in the records of the Sheriff's process server to the effect that a warrant for a search of the Haire house was issued on *Monday, May 8,* and that the warrant was returned on *Tuesday, May 9,* and reflected the seizure of a pair of trousers and a pair of shoes with nothing being said about the gun.

Apparently, the warrant was issued at the behest of then Deputy Prosecuting Attorney, H. Clay Robinson, Jr., who now practices in Fort Smith. Mr. Robinson has been contacted by counsel; he advised them that during his period in office he was instrumental in obtaining

many search warrants; that he has no personal recollection of the Haire warrant, and that he would so testify if called as a witness.

If the gun had been found as a result of a search authorized by the supposed warrant, it is inconceivable to the Court that the return on the warrant would not have reflected a seizure of the gun. It seems evident that the officers went to the house on the evening of May 7 without any warrant and found and took at least the gun. They may have returned on May 8 perhaps with a warrant, whether valid or invalid, and seized the trousers and shoes. The Court so finds.

■ It follows that it was constitutional error to admit the gun in evidence and the ballistics testimony based on a comparison with a bullet or bullets fired from that gun with one or more of the bullets taken from Jackson's body, on the basis of the warrant or supposed warrant.

It does not necessarily follow, however, that the warrantless search of the house and the seizure of the gun on Sunday, May 7, and the possibly later seizure of the other materials either with or without a warrant, were unreasonable, unlawful, or unconstitutional.

■ If a person situated as was Haire on the afternoon of May 7 spontaneously advises investigating officers that evidentiary material is to be found in a given place in his house, the Court thinks that the volunteering of such information is tantamount not only to a consent to a search of the house but also to an invitation to the officers to make the search, and that they are free to act on it.

And the Court concludes that in the circumstances of this case the search of Haire's house and the seizures of the gun, the shoes, and the trousers did not violate any right of Haire protected by the Fourth Amendment as carried forward into the Fourteenth Amendment.

Before concluding this memorandum the Court will point out that in 1967 the

Supreme Court in Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, held that the Fourth and Fourteenth Amendments do not prohibit "evidentiary searches," and that Rule 41(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., permits searches not only for stolen or embezzled property but also for property that is designed or intended for use or which is being or has been used as the means of committing a criminal offense.

The Court thinks that the Arkansas Legislature might do well to enact legislation similar to Rule 41(b). Further, this case makes it clear that Arkansas needs to prescribe definite procedures for the preserving and handling of search warrants and affidavits therefor, and that those procedures should be followed strictly.

An order dismissing the petition will be entered. Mr. Anderson is requested to advise petitioner of his right to appeal to the United States Court of Appeals for the Eighth Circuit, and, if requested by petitioner, to prepare and file a notice of appeal. The Court will permit such notice to be filed in forma pauperis. Mr. Anderson need not represent petitioner further in the prosecution of an appeal.