**L. V. HAIRE, Appellant,**

v.

**Robert SARVER, Commissioner of Corrections, Appellee.**

**No. 20047.**

United States Court of Appeals, Eighth Circuit.

Feb. 5, 1971.

---

5. 5 U.S.C. § 551, et seq.

6. 5 U.S.C. § 554(a) (6).

7. 5 U.S.C. §§ 554, 556, 557.

Philip S. Anderson, Little Rock, Ark., filed brief for appellant.

Joe Purcell, Atty. Gen., Don Langston, Deputy Atty. Gen., and Mike Wilson, Asst. Atty. Gen., Little Rock, Ark., filed brief for appellee.

Before MEHAFFY and BRIGHT, Circuit Judges, and HARPER, Chief District Judge.

MEHAFFY, Circuit Judge.

L. V. Haire, defendant, was indicted for first degree murder for the killing of Freddie Lee Jackson, a sixteen-year old Negro boy.[1] Upon trial to a jury defendant was convicted of second degree murder and on direct appeal his conviction was affirmed by the Arkansas Supreme Court. Haire v. State, 245 Ark. 293, 432 S.W.2d 828 (1968). Defendant petitioned for a writ of habeas corpus which was denied by the federal district court, opinion reported in Haire v. Sarver, 306 F. Supp. 1195 (E.D.Ark.1969).

The issues on this appeal were resolved adversely to defendant by the Arkansas court in a unanimous opinion and also by the federal district court. They involve the admissibility of evidence of statements freely and voluntarily given by the defendant while in custody but without interrogation and whether such voluntary statements as to the location of the body and the murder weapon hidden in his home constituted a consent to the search. We affirm.

The facts in this case are not in dispute and are elaborately set out in the heretofore reported opinions, and in brief defendant has adopted the facts as recited by Chief Judge Henley in his opinion, Haire v. Sarver, *supra*. We briefly summarize.

The mother of the deceased reported his disappearance and stated to investigating officers that he was last seen leaving the mother's house in the company of defendant's wife who was subsequently identified and taken into custody. She apparently promptly admitted that the deceased had been murdered and that she and her husband committed the crime. While she was being questioned, defendant appeared voluntarily at the jail and was arrested. Defendant's wife told the officers that the body was in a wheat field on the right side of a county road. She was taken to the area where a search was conducted without success. Defendant was also taken to the scene and when his wife was asked whether she had not told the officers that the body was on the right hand side of the road, defendant, without waiting for her reply, stated, "no, Honey, on the left side." The wife was then asked where the gun was hidden and she replied that it was under the bed at her home. Again, defendant corrected her and stated that the gun was hidden in the fireplace. Defendant had not been given the *Miranda* warnings and was not interrogated. The body was found at the location defendant indicated. The two investigating officers accompanied by defendant's wife went to their house and found the gun where defendant said it was located. It was proven that the gun was the murder weapon from which six bullets had been fired into the body of the deceased. Sufficiency of the evidence is not challenged and the record reveals that defendant not only had threatened to kill the deceased but had purchased a box of bullets fitting the gun from a country merchant a short time prior to the crime. Thus, the evidence was sufficient to have justified the jury in finding deliberation and premeditation and a verdict of first degree murder, but the

---

[1]. There are no racial overtones in this case. Defendant is a Negro, the two deputy sheriffs who conducted the investigation are Negroes and the state prosecutor is a Negro.

jury verdict was for a sentence of twenty-one years for second degree murder.

*Admissibility of Defendant's Statements.*

██ Defendant argues in brief that in permitting evidence of self-incriminating statements of a person in custody but not in response to a direct question the Arkansas Supreme Court as well as the federal district court engrafted an exception to the *Miranda* rule, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is asserted that such a ruling is not countenanced by the explicit language of the Supreme Court in *Miranda*. We do not agree. Such an interpretation of *Miranda* as suggested would require a broad extension of *Miranda*— one that was not contemplated by the majority of the Supreme Court as clearly reflected by its opinion.

Defendant's argument assumes without record justification that he was interrogated but he was not interrogated at the scene or at any other time. He was under arrest and in custody and was taken to the scene. His wife had previously told the officers the location of the body. They could not find the body so the officers obviously thought that Mrs. Haire might be mistaken as to its location. It was in this light that questions were asked her. No question was put to defendant and his wife jointly, but only to the wife. The answer by defendant was freely, spontaneously and voluntarily given without any semblance of compelling influence. There is no evidence that he was interrogated prior to that time, and indeed there was no need to interrogate him as his wife had apparently immediately admitted that she and her husband had murdered Freddie Jackson. Both the Supreme Court of Arkansas and the federal district court found that the statements by defendant were voluntary and spontaneous and not in response to any interrogation of defendant by the officers. Defendant at no time was asked a single question and at the time he made the voluntary statements both he and his wife apparently were cooperative with the officers.

There is no background or atmosphere here in any wise comparable to the four cases in *Miranda*.

In the very first paragraph of Chief Justice Warren's majority opinion in *Miranda*, he stated:

"More specifically, we deal with the admissibility of statements obtained from an individual who is *subjected to custodial police interrogation* and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." (Emphasis added). 384 U.S. at 439, 86 S.Ct. at 1609.

In the second paragraph of Chief Justice Warren's opinion, he stated:

"There, [Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 21 L.Ed.2d 977 (1964)] as in the four cases before us, law enforcement officials took the defendant into custody and interrogated him in a police station for the purpose of obtaining a confession." 384 U.S. at 440, 86 S.Ct. at 1610.

On the following page (384 U.S. at 441, 86 S.Ct. at 1611), the Chief Justice said that certiorari was granted in those cases "in order further to explore some facets of the problems, thus exposed, of applying the privilege against self-incrimination to *in-custody interrogation* * *." (Emphasis added.)

In more specifically describing the cases and the issues, the Chief Justice said on page 445, 86 S.Ct. at 1612:

"In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. * * * They all thus share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights."

The Chief Jusitce said at 384 U.S. at 457, 86 S.Ct. at 1618:

"In each of the cases, the defendant was thrust into an unfamiliar atmos-

phere and run through menacing police interrogation procedures."

In fact we find that the word "interrogation" is used at least one hundred twenty-nine times in the course of his opinion.

The Chief Justice made quite plain that statements given freely and voluntarily without any compelling influence are admissible and that the fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel but whether he can be interrogated. He stated:

> "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

> "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478, 86 S.Ct. at 1630.

In the case at bar, despite the fact that defendant was in custody for several hours before the statements were made, there is no allegation that he was questioned at all during this period and no evidence of any semblance of pressure or coercion or lack of voluntariness of the statements. "If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time." 384 U.S. at 474, 86 S.Ct. at 1628. We hold that the district court was correct in finding that defendant's statements were spontaneous and voluntary and note that it is not controverted that defendant actually made the statements.

*The Search and Seizure.*

It is next contended that the murder weapon and the articles of clothing were inadmissible as being obtained without a search warrant. Justice George Rose Smith, speaking for the Supreme Court of Arkansas, said:

> "The only testimony on the point is Officer Lewis's uncontradicted statement that the officers 'got a search warrant and went to the house with it.'" Haire v. State, *supra*, 432 S.W. 2d at 830.

In the habeas corpus proceeding Judge Henley observed that neither the warrant nor the affidavit was put into evidence or included in the case file and that "the testimony about the warrant was extremely indefinite, as was the testimony about the date of the search." Haire v. Sarver, *supra*, 306 F.Supp. at 1198. Judge Henley requested counsel to try to find out more about the supposed warrant and to attempt to stipulate in that connection. In response to the court's request the attorney for the defendant and the state's attorney entered into a stipulation that their investigation failed to reveal either a warrant or an affidavit but that the process server's book in the office of the sheriff indicated that a search warrant for the premises of defendant was received in the Sheriff's office May 8, 1967 and returned May 9, 1967, and that shoes and trousers were found. The full text of the stipulation omitting the style of the case and

the signatures of the respective attorneys appears below.[2]

Thereafter Judge Henley found:

"If a person situated as was Haire on the afternoon of May 7 spontaneously advises investigating officers that evidentiary material is to be found in a given place in his house, the Court thinks that the volunteering of such information is tantamount not only to a consent to a search of the house but also to an invitation to the officers to make the search, and that they are free to act on it." Haire v. Sarver, *supra*, 306 F.Supp. at 1199.

The consent to search is ordinarily a question of fact. This court said in Maxwell v. Stephens, 348 F.2d 325, 336 (8th Cir. 1965), cert. denied, 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965), "Nevertheless, the existence and voluntariness of a consent is a question of fact." See also Wren v. United States, 352 F.2d 617 (10th Cir. 1965), cert. denied, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966); United States v. Page, 302 F.2d 81 (9th Cir. 1962).

In reviewing a trial court's determination, it has been held that the "clearly erroneous" rule is applicable. Wren v. United States, *supra*; United States v. Page, *supra*. Compare Lowrey v. United States, 161 F.2d 30, 34 (8th Cir. 1947), cert. denied, 331 U.S. 849, 67 S.Ct. 1737, 91 L.Ed. 1858 (1947); Kincade v. Mikles, 144 F.2d 784 (8th Cir. 1944).

█ In this case there is an abundance of substantial evidence to support the district court's finding and certainly we cannot say that its finding is "clearly erroneous."

In Rice v. Warden, 237 F.Supp. 463 (D.Md.1964), aff'd in an unpublished memorandum opinion, No. 10,112, 4th Cir. June 17, 1965, the district court held that consent existed on similar facts. The court said "consent is strongly implied from the giving of clear, concise and explicit directions to the police both as to what to seek and where to seek."

If more need be said in justification for this search, we note in canvassing the record that (unmentioned in either the Arkansas opinion or the federal habeas corpus opinion) defendant's wife escorted the two deputy sheriffs to her house on Sunday when the murder weapon was retrieved. Deputy Sheriff Lewis testified as follows:

"Q. Did you go get it [the murder weapon]?

"A. I went and got it.

"Q. Who went with you?

"A. Officer McDaniel and we was escorted by Mrs. Norma Jean.

"Q. Norma Jean Haire?

"A. Yes, sir.

"Q. This was on Sunday?

"A. Yes, sir."

Since the Arkansas court and particularly the federal district court decided this case on the record, we feel free to "draw upon the cold record." Compare Mr. Justice Blackmun's concur-

---

2.           "STIPULATION

"It is stipulated and agreed by and between the parties as follows:

"1. That the Process Server's Book in the office of the Sheriff of Pulaski County shows at Page 261, Line 19, that a search warrant for the premises of L. V. Haire was received in the Sheriff's office on May 8, 1967, and returned May 9, 1967, by Deputy Sheriffs Lewis and McDaniel. The notation shows that the warrant was procured by Clay Robinson, who was a Deputy Prosecuting Attorney at that time, and that shoes and trousers were found.

"2. That diligent inquiry by both counsel for petitioner and counsel for respond-

ent failed to reveal either a warrant or an affidavit for the same.

"3. That the Honorable Clay Robinson, formerly Deputy Prosecuting Attorney for Pulaski County, is presently unable to remember whether a warrant was issued in this case, and that Mr. Robinson, if called as a witness in this case, would testify that he procured many warrants during his service as Deputy Prosecuting Attorney for Pulaski County and that he cannot specifically recall all of the warrants that he procured.

"This stipulation entered into this 19th day of September, 1969."

ring opinion in Dutton, Warden v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed. 2d 213 (1970).

We have specifically held that the wife of a defendant could consent to the search of her home. Roberts v. United States, 332 F.2d 892 (8th Cir. 1964), cert. denied, 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1965). In *Roberts* the wife of the defendant told the officers that her husband had owned a pistol and approximately one year before he had fired it into the ceiling of their home. With her consent the officers went to the home and retrieved the bullet which was subsequently identified as having been fired from the murder weapon.

We must bear in mind that this was a limited search and that the Fourth Amendment only prohibits unreasonable searches. Both Mrs. Haire and her husband were completely cooperative and it can only be inferred that they wanted to make a clean breast of the murder, and there was nothing unfair or unreasonable about the search and seizure. The officers in this case did only what was reasonable and practical under the circumstances. They would have been derelict in their duty if they had not accompanied Mrs. Haire to her home and retrieved the murder weapon where defendant said it was located. Reasonableless is in the first instance for the district court to determine.

Defendant argues that there could be no effective consent to search his house in the absence of a warning of his rights under the Fourth Amendment. He relies on Wren v. United States, *supra,* but in *Wren* no such warning was given and the search was upheld. Also, defendant relies on United States v. Blalock, 255 F. Supp. 268 (E.D.Pa.1966), but the district court's view in Blalock has been rejected by the First Circuit in Gorman v. United States, 380 F.2d 158 (1st Cir. 1967), and in United States ex rel. Combs v. LaVallee, 417 F.2d 523, 525 (2nd Cir. 1969), cert. denied, 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970), the court said "The courts are competent to determine whether valid consent has been given absent such warnings." In this case the evidence was sufficient to support a verdict of first degree murder.

Appellate courts, in their zeal to protect a defendant, are sometimes prone to overlook that the object of a criminal trial is to determine the guilt or innocence. It would be a great miscarriage of justice to reverse this case and a greater injustice to extend the *Miranda* rule. The very able counsel for defendant in this case has done what can be done from the record in any extended criminal trial. He has combed the record and presented appealing, while invalid, arguments, but we know of no stronger evidence obtainable, short of a full and complete confession, than for defendant to voluntarily without interrogation tell the officers where the body and the murder weapon were located, both of which linked defendant inescapably to the crime.

The judgment denying the petition for habeas corpus is affirmed.

BRIGHT, Circuit Judge (dissenting).

I respectfully dissent.

The record in the instant case represents a conviction obtained in flagrant disregard of an individual's constitutional rights. I do not agree with the majority that the appellant's incriminating statements were "freely, spontaneously and voluntarily given without any semblance of compelling influence." An examination of the circumstances surrounding the facts as conceded by appellant for purposes of this appeal show a violation of the defendant's Fifth Amendment rights as enunciated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

It is important to examine initially the circumstances surrounding the appellant's in-custody statements mindful of the Supreme Court's pronouncements in *Miranda.* Chief Justice Warren, speaking for the Court, said:

[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial inter-

rogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

> \* \* \* \* \* \*

For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere.

> \* \* \* \* \* \*

After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him. [384 U.S. at 444, 468, 479, 86 S.Ct. at 1612, 1624, 1630 (footnotes omitted.)]

The prosecution concedes the police furnished Haire no *Miranda* warnings from the time of his arrest on a Sunday afternoon until he was taken before the prosecuting attorney the next morning. The trial testimony discloses that sheriff's deputies took appellant's wife, Norma Jean Haire, into custody following an investigation concerning the victim's disappearance. The appellant, accompanied by two other "boys", followed his wife to the jailhouse about thirty minutes later. Upon their arrival, officers arrested and incarcerated all three men on "suspicion". Sheriff's deputies interrogated Norma Jean concerning the victim's disappearance and quickly learned that his body might be found in a wheat field in a rural area known as "Sweet Home Bottoms". The same sheriff's deputies then took appellant's wife to the "Bottoms" area to search for the victim's body. After the three deputies and appellant's wife searched unsuccessfully, Chief Deputy Hill, in charge of the search, ordered two other deputy sheriffs to bring the appellant from the jail to the search scene. Appellant, in handcuffs, arrived after dark. When asked why the appellant had been taken from the jail to the rural area, Deputy Sheriff McDaniel testified that Haire "was brought out there to show us the body." Deputy Sheriff Lewis, who later obtained Haire's incriminating statements, testified as follows:

Q  Where did you go looking for the body?

A  Down at Sweet Home Bottoms, about three miles east of Sweet Home, northeast.

Q  Just tell us what you did when you got down there?

A  We got down there and we looked for the body.

Q  Who is "we?"

A  McDaniel and the Chief—Chief Hill, Officer McDaniel and Chief Hill.

Q  That is Deputy Sheriff McDaniel?

A  Yes, sir.

Q  Did you find the body?

A  No. After looking for the body a while, the Chief sent back and had L. V.* brought out to the scene.

Q  Did L. V. come out there?

A  He came out with two more deputies.

* L. V. Haire.

Q  Tell us what happened.

A  Then I asked Mrs. Haire what she had said about where the body was.

Q  Was L. V. there?

A  L. V. was standing there then.

\*  \*  \*  \*  \*  \*

A  And she said it was on the right-hand side going from—I mean coming from Sweet Home, and L. V. said, "No, Honey, on the left."

\*  \*  \*  \*  \*  \*

Q  Now, did you look on the left?

A  We looked on the left.

Q  What else did you do?

A  Then I asked Mrs. Haire where she said the gun was. She said the gun was————

\*  \*  \*  \*  \*  \*

Q  \*  \*  \* She said the gun was where now?

A  Under the bed.

Q  What else happened?

A  He said, "No, it's \* \* \*"

Q  (Interposing) Who is that now?

A  L. V. said, "No, it's up in the fireplace."

Q  And he corrected her again?

A  Yes, sir.

Q  And he said, "No, it's in the fireplace," all right.

A  And then he asked me could he get in the car with his wife.

Q  L. V. did?

A  Yes, sir.

The officers discovered the victim's body the next day, Monday, May 8, 1967, on the left side of the county road. They also searched appellant's home and found the gun. On the same morning, sheriff's deputies took appellant to the county prosecuting attorney's office who then first warned Haire of his constitutional rights. Appellant immediately refused to make any statement and requested counsel which was furnished him.

This night-time excursion by the officers in order that Haire might "show \* \* \* [them] the body" and Haire's subsequent in-custody responses fall squarely within the proscription of the *Miranda* rules. In *Miranda*, Chief Justice Warren stressed the evils of "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." 384 U.S. at 445, 86 S.Ct. at 1612. Such an atmosphere produces compelling pressures upon the defendant to speak where he would otherwise remain silent and "carries its own badge of intimidation." 384 U.S. at 457, 86 S. Ct. at 1619.

Relying upon the testimony of Deputy Sheriff Lewis, previously recited, and upon his further conclusionary, and somewhat incredible, testimony that the appellant "automatically told us where the body was", the Arkansas courts and the federal district court concluded that appellant's statements were not produced as a result of police interrogation and thus fell outside the dimensions of *Miranda*. Lewis' testimony furnishes but a slender reed to support the conclusion that *Miranda* is inapplicable in this case. On the other hand, the record clearly discloses the following circumstances surrounding the obtaining of appellant's incriminating statements which, considered together, carry their own "badge of intimidation" : (1) Sheriff's deputies initially separated Haire from his wife and took her into custody for interrogation; (2) Police arrested Haire and his two friends without a warrant immediately upon their arrival at the jailhouse; (3) Three deputies took Haire's wife to the rural "Bottoms" area to search for the victim's body; (4) Approximately four hours after his arrest, sheriff's deputies brought Haire, then handcuffed, to the "Bottoms" to help find the body; (5) The search took place at night with a search party consisting of five policemen and a friend of one of them; (6) Haire remained in handcuffs throughout this entire night-time excursion; (7) The sheriff's officers interrogated Mrs. Haire in Haire's presence; and (8) Haire requested per-

mission to join his wife in an automobile immediately after making the incriminating statements.

It is most significant upon the issue of whether Haire spoke voluntarily or under compulsion that the record discloses that upon being advised of his constitutional rights by the prosecuting attorney on the following morning, the accused immediately demanded and received counsel. I think it immaterial that Deputy Sheriff Lewis testified that Haire responded to questions directed at his wife, rather than himself. *Miranda* renders compelled disclosures inadmissible into evidence. The *Miranda* decision (384 U.S. at 456, 86 S.Ct. 1602), in citing Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), recognizes the proposition that an arrested person will likely respond to pressures or threats directed to his family. Here, questions directed at either one of the beleaguered pair would likely demand responses from either. The circumstances presented in the instant case are easily distinguishable from examples of spontaneous, voluntary statements or confessions to which *Miranda* is inapplicable: those of persons not in custody who enter a police station and confess, Bowman v. Peyton, 287 F.Supp. 863 (W.D.Va.1968), statements given by persons not under restraint during general police investigation, United States v. Hamlin, 432 F.2d 905 (8th Cir. 1970); United States v. Tobin, 429 F.2d 1261 (8th Cir. 1970); Cohen v. United States, 405 F.2d 34 (8th Cir. 1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969), or statements voluntarily or spontaneously given after police furnished all *Miranda* warnings, Barnhill v. United States, 429 F.2d 340 (8th Cir. 1970); Klingler v. United States, 409

F.2d 299 (8th Cir.), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969). See *Miranda, supra,* 384 U.S. at 477–478, 86 S.Ct. 1602.

Upon reviewing this record, I believe that the Arkansas courts, as well as the federal district court and the majority, misinterpret the scope of *Miranda.* The issue is not solely whether an accused in custody speaks without responding to a specific question, but whether the inherent pressures of an interrogation atmosphere compelled that response. The circumstances in the instant case constituted the very evil which Chief Justice Warren decried in *Miranda:* "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." 384 U.S. at 445, 86 S.Ct. at 1612. Of course, the coercive environment surrounding custodial interrogation may extend beyond the walls of the police station. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Responses elicited under such pressures are, absent appropriate *Miranda* warnings, excluded from evidence.[1]

In Bosley v. United States, 138 U.S. App.D.C. 263, 426 F.2d 1257 (1970), the court enunciated what I believe to be the proper interpretation of *Miranda:*

> [A]t some point in time during the course of the arrest it could no longer be contended that the police were without opportunity to give the *Miranda* warning. We believe that *Miranda* does require the police to warn an arrested suspect of his rights as immediately as practicable after arresting him. A heavy burden rests on the Government to prove any contention that the arrested suspect volun-

---

1. In considering the *Miranda* issue, I note that testimony was offered on Haire's behalf that he returned from the Sunday night excursion badly bruised, cut and bleeding. The prosecution offered no rebuttal to this evidence, other than to show the incarcerated status of witnesses who described Haire's physical condition following this night search. The intro-

duction of such evidence may suggest the necessity of a Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), hearing on the voluntariness of Haire's statements. See Hizel v. Sigler, 430 F.2d 1398, 1401 (8th Cir. 1970); United States v. Taylor, 374 F.2d 753, 756 (7th Cir. 1967).

teered a statement without any "interrogation," explicit or implicit, on the part of the police and before he could be warned of his rights. [426 F.2d at 1261]

I would apply that rule to this case. Sheriff's deputies had more than ample opportunity to advise the appellant of his constitutional rights as required by *Miranda,* but chose not to do so. Moreover, I am unconvinced that the prosecution has sustained its heavy burden of proving that appellant's incriminating statements were made without any interrogation, either express or implied.

Turning to the search and seizure claim, again, I am unable to subscribe to the majority's view on this issue. Based solely upon testimony of Deputy Sheriff Lewis that he and his partner had obtained a search warrant and then retrieved the gun from the Haire residence, the Arkansas state trial court received the exhibit over defendant's objections. On appeal, the Arkansas Supreme Court rejected appellant's contentions regarding the admissibility of the gun, concluding that: "The record contains neither a specific objection nor a showing that the exhibits were seized without a warrant." Haire v. State, 432 S.W.2d 828, 830 (1968). The federal district court, pursuant to the stipulation set forth in the majority opinion, concluded that the officers had seized the weapon without a warrant, but justified the seizure as consensual by reasoning that appellant's statements in the wheat field operated as an invitation to the officers to obtain the gun in his home. In effect, at least in regard to obtaining a search warrant, the federal district court found witness Lewis' testimony to be untrue.

A consent to search, in order to be voluntary, must be unequivocal, specifically and intelligently given and uncontaminated by any duress or coercion and such consent is not lightly inferred. Rosenthall v. Henderson, 389 F.2d 514, 516 (6th Cir. 1968). When the prosecution seeks to rely on consent to justify the lawfulness of the search, it assumes the burden of proving that the consent was, in fact, freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The majority concludes that the appellant's night-time statements to the officers operated as a consent to search his home. Since the Supreme Court, in *Bumper, supra,* has ruled that the prosecution has the burden of proving that consent to search was freely and voluntarily given, I am of the opinion that the prosecution in the instant case has failed to sustain that burden.

The State of Arkansas, in its brief, suggests that if Haire did not in fact consent to the search, his wife did. Such consent, it asserts, validates the seizure of the gun. In upholding the district court, the majority apparently adopts this view as an alternative ground for affirmance on this issue and cites Roberts v. United States, 332 F.2d 892 (8th Cir. 1964), cert. denied, 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1965), which holds that a defendant's wife may consent to a search of her home. This alternative contention has never been presented to the Arkansas state courts or to the federal district court and it should be first examined in an appropriate state evidentiary hearing.

In summary, I would reverse the district court and direct that the writ of habeas corpus issue, unless the State of Arkansas elects to retry Haire within a reasonable period of time.[2] While I concur in the majority's statement that the object of a criminal trial is to determine guilt or innocence, I do not believe that such an objective justifies the infringement of rights guaranteed an accused by the Constitution of the United States. In 1952, J. Edgar Hoover, Director of

2. It should be pointed out that a reversal of a conviction based upon unconstitutional evidence leaves the State free to retry the defendant on the same charge without the tainted evidence. Orozco v. Texas, 394 U.S. 324, 327, n. 4, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

the Federal Bureau of Investigation, observed:

> Law enforcement, however, in defeating the criminal, must maintain inviolate the historic liberties of the individual. To turn back the criminal, yet by so doing, destroy the dignity of the individual, would be a hollow victory.[3]

These observations hold true today and, I believe, are particularly applicable in this case.

3. Hoover, Civil Liberties and Law Enforcement: The Role of the FBI, 37 Iowa L.Rev. 175, 177 (1952).