Phillip Raymond RICE

v.

WARDEN, MARYLAND STATE PENITENTIARY.

Civ. A. No. 11108.

United States District Court
D. Maryland.

Dec. 14, 1964.

464

Lawrence F. Rodowsky, Baltimore, Md. (court appointed), for petitioner.

Thomas B. Finan, Atty. Gen., and Fred Oken, Asst. Atty. Gen. of Maryland, for respondent.

R. DORSEY WATKINS, District Judge.

Petitioner, a Maryland state prisoner, seeks in this court for the fourth time the issuance of a writ of habeas corpus. Rice was charged as an accessory before and after the fact in four cases of armed robbery. He was also indicted as an accessory to assault with intent to murder. Represented by court appointed counsel he pled not guilty to all of the offenses with which he was charged and prayed a court trial. The State elected to proceed first on three of the indictments charging petitioner as an accessory to armed robbery and petitioner went to trial in the Criminal Court of Baltimore on December 14, 1956. He was convicted on the three indictments and was sentenced to twenty (20) years in the Maryland Penitentiary in each case, the sentences to run consecutively. The State entered a stet in each of the two additional indictments.

Petitioner did not appeal his conviction directly to the Court of Appeals of Maryland. He did, however, shortly after his conviction, seek a writ of habeas corpus in the state courts, challenging the legality of his detention on numerous grounds. His petition was denied by the lower court and leave to appeal from that adverse decision was denied by the Court of Appeals of Maryland. (Rice v. Warden, 1957, 214 Md. 613, 135 A.2d 622). Certiorari was denied by the Supreme Court of the United States, 1955, 355 U.S. 966, 78 S.Ct. 557, 2 L.Ed.2d 541. Thereafter, petitioner filed an application for relief under the Uniform Post Conviction Procedure Act, Article 27, section 645A et seq., Annotated Code of Public General Laws of Maryland. This petition was denied by the lower court and was followed by a denial by the Court of Appeals of Maryland of leave to appeal. (Rice v. Warden, 1959, 221 Md. 604, 156 A.2d 632). In addition to the petitions filed in the state courts, Rice has filed in this court three previous petitions seeking federal habeas corpus relief, all three of which were denied by Chief Judge Roszel C. Thomsen. Subsequent to Judge Thomsen's last denial of relief, a series of opinions by the Supreme Court of the United States led Judge Thomsen to conclude that petitioner's notice of appeal should be treated as a petition for rehearing, that denial of relief should be

stricken, that counsel to represent the petitioner should be appointed and that the petition should be set down for a hearing at a future date.

The hearing was had in open court before the undersigned judge. Counsel for the petitioner and counsel for the respondent stipulated that the records of all prior proceedings involving the petitioner, including the transcript of the testimony and the exhibits at his original trial, be made a part of the record in the instant case. Petitioner took the stand at the habeas corpus hearing and testified in his own behalf. Police Lieutenants Cooper and Butler testified for the respondent. After hearing all the testimony, the court ruled against the petitioner on the facts as to four of the five grounds asserted by him as a basis for relief. While permitting the filing of memoranda on these points, the court specifically requested briefs on the fifth point raised, that certain evidence admitted at the time of petitioner's original criminal trial had been obtained as the result of an illegal search and seizure.

The facts surrounding the alleged illegal search and seizure are not in dispute. On September 2, 1956 Donald Lee Dobson was released from the Maryland House of Correction, having served a three and one-half year sentence. He contacted petitioner Rice who was living, together with his girl friend Dolores Price and one William Dorsey, in the first floor apartment of a three-story building at 1206 Laurens Street, Baltimore, Maryland. The second and third floors were occupied by other persons not herein involved. Arrangements were made between Rice and Dobson whereby the latter for $5.00 a week rent would use the front room. Dorsey slept in the middle room and the petitioner and Dolores Price occupied the remaining bedroom. Dobson had his own key and was permitted full use of, and access to, the entire apartment.

Beginning in September and continuing through October of 1956, Dobson and James Percy Hall committed a series of holdups of taverns and liquor stores. Their illegal activities ended with the holdup of the Elgin Tavern on North Monroe Street on the morning of Friday, October 26, 1956. Characteristic of these robberies was the terrorization of the holdup victims by the use of shotgun, rifle and pistols. Dobson was picked up by the police on Saturday the 27th of October. He immediately implicated Rice and on the early morning of the following day, Sunday, October 28, 1956, at about 2 A.M. Lieutenant, then Sergeant, Butler, acting on the basis of the information received from Dobson, went to the apartment at Laurens Street to arrest Rice. Finding no one at home, Lieutenant Butler left.

Petitioner was arrested several hours later, at about 4 A.M., on Pennsylvania Avenue at a point about twelve blocks from his home. He was taken to the Central Police Station where during an interrogation of thirty to forty-five minutes petitioner informed the police that various guns belonging to Dobson were located in the apartment. He specified the particular place where each weapon could be found, indicating that a shotgun was in the bedroom in a hamper under dirty clothes and that a pistol was in the bedroom in a cabinet. The police immediately proceeded to the Laurens Street apartment. They found the weapons where they had been told to look. Subsequently, at the time of Rice's trial the pistol and some ammunition were admitted into evidence; the shotgun was not.

On Monday morning, October 29, 1956, petitioner was taken by the police from his place of detention at the Central Police Station to the Laurens Street apartment. There in the kitchen, under a washing machine, the police found a bag containing a gray striped coat and a pair of khaki army pants. Victims identified the coat as Dobson's and the pants as Hall's. These items of clothing were introduced into evidence at the time of the trial.

The trial which resulted in the petitioner's conviction was not his trial

alone. Dobson and Hall had been jointly indicted as principals in seven cases of armed robbery. Rice had been indicted separately as an accessory in four of these cases.[1] Dobson, Hall and Rice were arraigned on the same day. Dobson pled guilty to all charges against him; Hall and Rice, not guilty. The State then elected to proceed against Hall on the three indictments charging Dobson and Hall as principals in the armed robbery of the Elgin Tavern. Rice agreed in open court to be tried with Hall on the indictments against him as an accessory to the same holdup *"at the same time and on the same set of facts"* (Transcript of original criminal trial, page 11; emphasis supplied). The three indictments against Hall were then consolidated with the three indictments against Rice and the consolidated cases proceeded to trial. Assuming for the moment, without deciding, that there had been an illegal search and seizure, Dobson precluded any objection by himself on such grounds by his guilty plea. Hall

had no standing to object as to the search for, or seizure of, the guns, the shells and the gray coat, having neither owned nor possessed the seized property and having no possessory interest in the premises searched. Rice, separately indicted from Hall and Dobson, had the right to resist any attempt to try him jointly with Hall. He voluntarily agreed to a joint trial. Even in a joint trial he would have had the right to an instruction limiting only to the defendant against whom it was admissible, the effect of any evidence introduced. He waived this right when he knowingly agreed to a trial with Hall *"at the same time and on the same set of facts"* [2] (emphasis supplied). The court finds a waiver by Rice of his right to object to evidence admissible against Hall, said waiver arising out of not a mere failure to object to the admission of the fruits of an alleged illegal search and a failure to raise the question on appeal when such tactics would have been futile under the law as it then stood,[3] but rather

---

1. Other indictments pending against these defendants are not mentioned here as they are not relevant to the point involved.

2. Cf. on a factual basis the recent case of United States v. Boyce, 4 Cir. 1964, 340 F.2d 418.

3. This judge is, of course currently bound by the holding of the majority of the court, sitting en banc, in Hall v. Warden, Maryland Penitentiary, 4 Cir. 1963, 313 F.2d 483, and by the same three judges in Walker v. Pepersack, 4 Cir. 1963, 316 F.2d 119, that Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, is retroactive, and that evidence obtained by an unreasonable search and seizure cannot (and presumably never could) be admitted into evidence in a state court. Perhaps discretion would dictate a silent submission, but the point is so important that this judge feels justified in expressing, first, his disagreement (in which he is not alone—see United States ex rel. Angelet v. Fay, 2 Cir. 1964, 333 F.2d 12; United States ex rel. Eastman v. Fay, 2 Cir. 1964, 333 F.2d 28; United States ex rel. Linkletter v. Walker, 5 Cir. 1963, 323 F.2d 11, cert. granted 1964, 377 U.S. 930, 84 S.Ct. 1340, 12 L.Ed.2d 295; Sisk v. Lane, 7 Cir.

1964, 331 F.2d 235; Gaitan v. United States, 10 Cir. 1963, 317 F.2d 494) and, secondly, his complete inability to understand how the result stated by the majority in Hall was reached on the reasoning therein employed. The majority in Hall stated the pre-Mapp law as follows:

"In 1949, thirty-five years after Weeks, the Supreme Court decided Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, * * *. Although interpreting the *Fourth* Amendment as forbidding the admission of such evidence, the Court flatly stated: 'We hold, therefore, that in a prosecution in a State court for a State crime the *Fourteenth* Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure.' (Emphasis supplied.) 338 U.S. 25, 33, 69 S.Ct. 1359, 1364." (313 F.2d at page 491).

It continued:

"And *so the law remained* following Wolf v. Colorado (1949), supra, *until* the case of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, was decided on *June 19, 1961.* * * *" (Emphasis supplied; 313 F.2d at page 491).

"* * * However, the Wolf doctrine remained *undisturbed and controlling until* the decision in Mapp * * *."

arising out of an affirmative, positive choice on petitioner's part to be tried jointly with Hall and "on the same set of facts."

Nevertheless, the court will still examine and rule on the question of the legality of the search.

█ Since in the instant case the officers did not obtain a search warrant and since the search was not made incident to Rice's arrest, the search, to have been lawful, must have been made with Rice's consent. There is no contention that Rice expressly consented to a search. Consent, if it exists, must be implied from all of the surrounding circumstances. The leading case in this circuit on the question of implied consent to which this court looks in determining whether or not Rice gave his consent to the search and seizure, which he now seeks to challenge, is Hall v. Warden, Maryland Penitentiary, 4 Cir.1963, 313 F.2d 483, where three judges of the United States Court of Appeals for the Fourth Circuit, the court sitting en banc,

did not find sufficient evidence of a consent; Chief Judge Clement F. Haynsworth, Jr., then Circuit Judge, dissenting on the ground that substantial evidence supported the District Court's finding of consent and Circuit Judge Albert v. Bryan dissenting on the ground that the evidence clearly established a consent to the search. The majority opinion in Hall summarized the evidence relied upon to show consent as follows:

"Merely showing the officers the location of the hotel and telling them the number of his room are not sufficient to support a finding of Hall's consent to the search." (Hall v. Warden, Maryland Penitentiary, 313 F.2d 483, 494).

Next the factors negating consent were considered:

"* * * It seems clear that his consent was not requested and the police were obviously no more concerned with obtaining consent than they were when, earlier that evening, in Hall's absence and without

(Emphasis supplied; 313 F.2d at page 492).

Literally applied, we would have the following:

1. Rice was tried on December 14, 1956.

2. His prosecution was in a state court for a state crime.

3. Until June 19, 1961 (a) in a prosecution in a State court for a state crime, evidence obtained by an unreasonable search and seizure was admissible; and (b) the law thus stated remained undisturbed and controlling.

4. December 14, 1956 is prior to June 19, 1961, and therefore is within the period in which the law stated in (3) above remained undisturbed and controlling.

However, we then are told that the conclusion is "inescapable" (313 F.2d at page 495), that that which was the law on December 14, 1956, and "remained" the law "undisturbed and controlling until" June 19, 1961, was *not* the law on December 14, 1956, presumably had never been the law; and therefore could not have "remained" the law, and was certainly violently "disturbed" and uncontrolling (if a non-existing thing is subject to disturbance and uncontrolling effect).

That this unusual syllogistic reasoning was advertent is evidenced by the decision of the same three judges in the Walker case. They there stated:

"* * * At the time of that appeal [Walker's direct appeal] it seemed clear also that, because of the decision in Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the federal law did not prohibit the state's use of such evidence.

"* * * The *Wolf doctrine remained unchanged until* the decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (June 19, 1961), * * *.

"* * * Under the Maryland rule of law, no search warrant was required but this rule was in direct and violent conflict with the later decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (June 19, 1961).

"* * * At the time of Walker's trial and first appeal, it is clear that he did not intentionally abandon a *known right* since there *was then no such right* for him to abandon. That was before the Supreme Court's decision in Mapp." (Second emphasis the courts; the first and third, mine; 316 F.2d 119, at pages 125, 127, 127–128).

his knowledge or permission, they had ransacked his automobile. These police officers were fully aware that they were investigating a felony and it must be presumed that they were familiar with Maryland law and knew that any evidence found by them would be admissible no matter how it was obtained. The record would not support a determination that consent to search Hall's room could be implied from his conduct and from his failure to expressly object." (Hall v. Warden, Maryland Penitentiary, 1963, 313 F. 2d 483, 494).

Numerous, important factual differences exist between the Hall case and the instant case. Rice did not merely tell the officers where he lived and in what apartment. He would have had no need to do so as the officers already knew where he lived. He did not merely keep silent while the officers initiated and completed their search and seizure. He flatly stated that guns and clothing were kept at his house. He went further. Lieutenant Cooper's testimony that petitioner "said that the guns was [sic] kept at his house, clothing was kept at his house * * *" (Transcript of original criminal trial, page 58), was amplified by Lieutenant Butler's testimony to the effect that petitioner in addition to admitting that there were guns at the Laurens Street apartment "told me exactly where they were. He said we could find the shotgun in his bathroom at 1206 Laurens Street, in the hamper under dirty clothes; the pistol could be found in his bedroom in a cabinet, which it wasn't, but close by the cabinet it was found." (Transcript of original criminal trial, page 83). Consent is strongly implied from the giving of clear, concise and explicit directions to the police both as to *what* to seek and *where* to seek. In the instant case the petitioner, after giving explicit directions as to the search and seizure, when shown the seized material identified it without any hesitation. Such conduct is in direct contrast to the circumstances in the Hall case, where Hall after the

search and seizure was completed did not even know what material the police had found (Hall v. Warden, Maryland Penitentiary, D.C.1962, 201 F.Supp. 639, 646), and where Hall, while the search was in progress, "started crying and said 'I am not afraid to die, I'm afraid of going to hell. * * * They are going to find the clothes when they get up in the room'" (Hall v. Warden, Maryland Penitentiary, D.C.1962, 201 F. Supp. 639, 646).

The rationale behind the Hall case and other cases relied upon by the plaintiff such as Channel v. United States, 9 Cir.1960, 285 F.2d 217; Catalanotte v. United States, 6 Cir.1935, 208 F.2d 264; United States v. Rutheiser, D.C. S.D.N.Y.1962, 203 F.Supp. 891; and United States v. Kowal, D.C.D.R.I.1961, 197 F.Supp. 401, is succinctly stated in Judd v. United States, 1951, 89 U.S. App.D.C. 64, 190 F.2d 649, 651:

> "This burden on the Government [to show consent] is particularly heavy in cases where the individual is under arrest. Non-resistance to the orders or suggestions of the police is not infrequent in such a situation; true consent, free of fear or pressure, is not so readily to be found. United States v. Novero, D. C., 58 F.Supp. 275; United States v. McCunn, D.C.S.D.N.Y.1930, 40 F. 2d 295. In fact, the circumstances of the defendant's plight may be such as to make any claim of actual consent 'not in accordance with human experience', and explainable only on the basis of 'physical or moral compulsion'. Ray v. United States, 5 Cir., 84 F.2d 654, 656."

That is, why but for compulsion would one consent to the search for, and seizure of, incriminating articles?

Petitioner maintained from the time that he was first questioned by the police and throughout the entire trial of his case that the guns, ammunition and clothing did not belong to him, that the guns, ammunition and coat were Dobson's, that he first knew that the guns were in the apartment when he found

them while cleaning the apartment on the day before his arrest and that he had no knowledge of their use in the holdups. In other words he contended that these articles did not incriminate him. At the time that Rice was giving the police detailed information about the guns, etc., he made no statement implicating himself in the robberies under investigation by the police. Again, he took the position that the articles identified by him did not implicate him when, at the end of the State's case, his counsel moved for a directed verdict,[4] (a motion then used in Maryland practice). This was the position that he maintained when he chose to take the stand, subjecting himself to cross-examination, to testify in his own behalf as to his knowledge of the presence in the jointly occupied apartment[5] of the articles specifically identified by him to the police, as to his knowledge of their ownership, and as to his knowledge of their use.[6] He need not have testified. His corroborating witness, Dobson, stated the alleged facts even more favorably to petitioner than petitioner himself who, although denying guilty knowledge, admitted knowing that the guns were in the apartment.[7] It is clear from the transcript of the original trial that the petitioner did his case no good by taking the stand but this he chose to do. He was not compelled to testify. Nor does this court find that he was compelled by the police or the attendant circumstances to tell the police specifically *what* to search for and *where* to search. He chose to do so. That he did shows an invitation and consent to a search and seizure of the named articles; a consent by petitioner to the search of premises jointly occupied by him and by his room-

4. "I move for a directed verdict on Rice, your Honor in the accessory cases. The reason for that, sir, is that the admission here shows that these are not his weapons. All the State's case shows they are not his weapons. They were in the house, which in itself would not be evidence that they were his and there is nothing in this case which shows that he knew that whoever is charged here, Dobson and Hall, were going out to commit any holdups." (Transcript of original criminal trial, page 91).

5. The petitioner explained the extent of joint occupancy which existed as follows: " * * * Dobson is allowed to have company in my house, in other words, he have the use of my house, and in other words, when a roomer rooms at my house, I don't tell them no definite plan what they should do; I give them a key and they have to use the kitchen and cook and go through my bedroom to bathe." (Transcript of original criminal trial, page 114).

6. After the motion for a directed verdict was denied, the petitioner took the stand. Typical of his testimony as to his knowledge of the presence of the guns in the apartment jointly occupied by him and by Dobson and as to his knowledge of their ownership and use is the following:

"Q When did you first discover the guns at your house?
"A The same night.
"Q What night was that?
"A Saturday night when they arrested me, Sunday morning, rather.
"Q The Saturday night that they arrested you, you discovered that the guns—was that before or after you were arrested?
"A It was before I was arrested.
"Q And you discovered them that night. What did you do about it?
"A What did I do about it?
"Q Yes, when you found the guns, where were they?
"A There was nothing I could do about it; I had the impression it was Dobson and I knew Dobson would come home, so I was going to tell him to take them out of there."

The record is replete with similar testimony by the petitioner. (Transcript of original criminal trial, pages 98, 117, 120, 123, 124 and 125).

7. Dobson took the stand in petitioner's behalf. He specifically admitted his own guilt (Transcript of original criminal trial, pages 128 and 134). He admitted that the seized articles belonged to him and in effect substantiated petitioner's testimony by stating that to his knowledge petitioner was unaware of Dobson's participation in any hold-ups and was unaware of the presence of the weapons in the apartment. (Transcript of original criminal trial, page 131). The trial by court ended in the conviction of Dobson upon his plea of guilt and in the conviction of Hall and Rice upon a verdict of guilty.

er for articles *belonging to his roomer* is certainly readily explainable as in accordance with human experience and does not require an explanation on the basis of physical or moral compulsion.

In the cases relied upon by the petitioner as showing a lack of free and voluntary consent the invitation to search was never couched in language specifically telling the authorities what to look for and where to look. Rather, in these cases the invitation to search was always in the form of—well go ahead and look, but you won't find anything. For example:

> "I have nothing to hide, you can go there and see for yourself." (Judd v. United States, 1951, 89 U.S.App.D.C. 64, 190 F.2d 649, 651).

> "I have no stuff in my apartment and you are welcome to go search the whole place." (Channel v. United States, 9 Cir.1960, 285 F.2d 217, 219).

> "The house is yours. You won't find any narcotics here." (Catalanotte v. United States, 6 Cir.1953, 208 F.2d 264, 266).

> "We are going to look around and search the place. Do you mind?" "No, go right ahead." (United States v. Kowal, D.C.D.R.I.1961, 197 F.Supp. 401, 403, 405).

In each of these cases when the alleged invitation was accepted the authorities found and seized articles which the defendants had specifically denied were present and which highly incriminated the one giving the alleged consent. It is not unusual that in such circumstances some courts have been loath to find a true consent, free of duress and coercion and have rather characterized such an alleged consent as "the false bravado of the small-time criminal." In the instant case, rather than denying the presence of the weapons, the petitioner specifically named them and invited the search by informing the police of their exact location. That he would do so freely and without a feeling of duress is understandable in light of his persistently maintained position that he had no knowledge of the illegal use to which the guns were put by Dobson, the owner of the weapons.

Nor is it without significance that the police waited until Rice gave his consent to initiate the search of the apartment jointly occupied by petitioner and by Dobson. Unlike the Hall case where "earlier that evening, in Hall's absence and without his knowledge or permission, * * * [the police] had ransacked his automobile", here the police earlier in the morning had gone to petitioner's apartment to arrest him and upon finding him not at home had left. No effort whatsoever was made at that time to conduct a search. No search was initiated (if, indeed, search in a technical sense is the proper word when one is told both what to look for and where to look) until after the petitioner gave what this court has found to be his consent and what by their conduct it is shown that the police believed was his consent.

■ Highly persuasive as to the interpretation that should be placed on the language used by the petitioner is the construction that he himself now places on the same language by his conduct. In all of the cases cited by the petitioner on the question of consent, the language relied upon by the arresting authorities as giving consent was not at issue; the legal effect of such language was at issue. Here the petitioner took the stand at his habeas corpus hearing before this court to deny categorically, not the meaning and effect of the giving of explicit directions as to what would be found and where it would be found, but to deny that such directions were ever in fact given. Petitioner maintains that he could not have given such information to the police as he knew nothing about the presence of the guns and ammunition in the apartment until after his arrest when for the first time he saw them on Lieutenant Cooper's desk at the Central Police Station and was advised by the police that they had been taken from the apartment jointly occupied by him and by Dobson. He denied ever having testified to the con-

trary. This, although at his original criminal trial he testified under oath at least seven times that he found the weapons on Saturday, the day before his arrest, while in the process of cleaning house:

"I didn't know anyone was using them [the guns, shells and other equipment]. When I first run across them was on Saturday." (Transcript of original criminal trial, page 98).

\* \* \* \* \* \*

"Q When did you first discover the guns at your house?

"A The same night.

"Q. What night was that?

"A Saturday night, when they arrested me, Sunday morning, rather.

"Q The Saturday night that they arrested you, you discovered that the guns—was that before or after you were arrested?

"A It was before I was arrested." (Transcript of original criminal trial, page 104).

\* \* \* \* \* \*

"There had never been a gun until Saturday, that I run across these." (Transcript of original criminal trial, page 106).

\* \* \* \* \* \*

"I didn't see them until this time, which was a Saturday morning, when me and my girl friend was cleaning up and we run across them." (Transcript of original criminal trial, page 117).

\* \* \* \* \* \*

"Not until today, your Honor, we, me and my girl friend was cleaning up on Saturday and I found these [guns and ammunition] in a bag and Dolores said, 'you have to get these out' \* \* \* (Transcript of original criminal trial, page 120).

\* \* \* \* \* \*

"Your Honor, there was never any guns around my house until these guns were found in there, which I seen the shotgun and the 32 revolver that Saturday evening." (Transcript of original criminal trial, pages 123–124).

\* \* \* \* \* \*

"Q How did you know the guns were in there?

"A The Saturday I was cleaning up." (Transcript of original criminal trial, page 125).

When at the habeas corpus hearing the court read the above sections of the transcript of the original criminal trial to the petitioner, the petitioner denied ever having so testified and questioned the accuracy of the transcript. The court finds as a fact that the petitioner testified at his original criminal trial as shown by the transcript. The petitioner's blatant perjury during the course of his testimony at his habeas corpus hearing was committed in an attempt to convince the court that explicit information as to the articles seized was not, and could not have been, given to the police by petitioner. The court finds on the basis of reasonable inferences to be drawn from the petitioner's testimony at the time of his original criminal trial and from the direct testimony of Lieutenant Cooper and Lieutenant Butler at the original trial, which testimony was not *then* contradicted by petitioner and from these officers' testimony at the habeas corpus hearing that the petitioner gave explicit directions to the officers as to what to look for and as to where to look. Petitioner's attempt to deny at this late date what he actually did and what he actually said strongly suggests that petitioner himself is well aware that his conduct and the language used by him was in fact an invitation and consent by him for the police to enter the premises at Laurens Street and seize the articles in question.[8] For all of the

8. The court does not reach the question of whether or not petitioner's consent would have bound Dobson over his objection. Dobson waived any right to object by virtue of his guilty plea. Petitioner waived at least his own right to object by the giving of his consent.

foregoing reasons the court finds as a fact and concludes as a matter of law that petitioner invited and consented to a search without a warrant.

■ Counsel for petitioner has argued that there were two searches and seizures, one of Sunday morning resulting in the seizure of the weapons and ammunition and one of Monday resulting in the seizure of the coat belonging to Dobson and the pants belonging to Hall, and that if consent was given as to the "first search," it was not as to the "second." While it is true that the police twice within approximately twenty-four hours went to the Laurens Street address, the consent once given extended to both visits. Rice accompanied the officers to the apartment on Monday. Lieutenant Cooper testified at the habeas corpus hearing that Rice must have requested the opportunity to point out the whereabouts of the articles in which the police were interested. Otherwise, Lieutenant Cooper stated, there would have been no reason for taking the petitioner back to the apartment. The court accepts this testimony rather than the petitioner's flat denial, in the form of a conclusion, at the time of the hearing that he gave "permission" for the Monday entry. In view of petitioner's initial consent; his continuing consent evidenced by his subsequent accompanying of the officers in order to aid them in locating the clothing; the fact that there was no reason for Rice not to consent to the search for clothing belonging to Dobson, his roomer, and to Hall, his roomer's friend, the presence of such articles in the apartment being without any invidious implication as to petitioner; and for all of the reasons previously discussed in regard to the Sunday entry this court finds as a fact and concludes as a matter of law that the Monday entry without a search warrant was a legal entry made pursuant to the consent of the petitioner.

The present petition is therefore without merit as the "search and seizure" were not illegal. Even had they been, petitioner's voluntary choice of a joint trial with Hall "at the same time and on the same set of facts" would have barred him from objecting to the admissibility of any evidence admissible against Hall.

Accordingly, the petition for a writ of habeas corpus is hereby denied.

The Clerk is directed to mail a copy of this Memorandum Opinion and Order to the Attorney General of the State of Maryland, to the petitioner's court appointed counsel, Mr. Lawrence Rodowsky (to whom the court expresses its appreciation for his excellent representation of petitioner) and to the petitioner himself.