754 A.2d 1074

**Kim Leon TURNER**

v.

**STATE of Maryland.**

**No. 1266, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 30, 2000.

194

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Rachel M. Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County of Towson, on the brief), for appellee.

Submitted before DAVIS, BYRNES and JOHN J. BISHOP, (Retired, Specially Assigned), JJ.

BYRNES, Judge.

In this case, we must decide on independent constitutional review whether, on the facts as found by the Circuit Court for Baltimore County, Kim Leon Turner, appellant, impliedly consented to the entry of police officers into his residence.

Appellant was charged with possession of cocaine with the intent to distribute. Before trial, he moved to suppress the cocaine from evidence, arguing that it was the fruit of an illegal police search of his apartment. The motion was denied, and appellant was tried by the court on an agreed statement of facts. He was found guilty of possession with intent to distribute over fifty grams of cocaine and was sentenced to a term of five years incarceration, to be served without the possibility of parole.

On appeal, appellant asks whether the lower court erred in denying his suppression motion. We hold that it did, and shall reverse the judgment and remand the case for further proceedings.

## FACTS AND PROCEEDINGS[1]

Two witnesses testified at the suppression hearing: Officer Stephen Gillespie and Officer Stephen C. Price, both of the Baltimore County Police Department. They gave the following version of events.

On August 18, 1998, at approximately 1:50 a.m., Officer Gillespie was on patrol in his police cruiser when he noticed an older model Chevrolet Caprice being driven westbound on White Marsh Boulevard. Officer Gillespie observed that the Caprice was "faded and dirty" but that its license tags appeared "fairly new." Thinking that suspicious, he called the

---

1. When reviewing the denial of a motion to suppress, the record of the suppression hearing is the exclusive source of facts for our review. *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000); *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999); *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987). For that reason, the facts that we recite are as testified to at the suppression hearing.

tags in over the police radio, and learned that they were not registered to the Caprice.

Officer Gillespie activated his emergency equipment and attempted to make a traffic stop. The driver of the Caprice sped off, and a chase ensued. It ended when Officer Gillespie pulled his cruiser in front of the Caprice, forcing it to a stop. The driver then "bailed out" of the car and fled.[2] Other officers who had been called to assist during the chase pursued him on foot, to no avail.

In the meantime, Officer Gillespie stayed with the Caprice and ran an MVA check, which revealed that it was registered to appellant and that appellant lived in a nearby apartment complex. Officer Gillespie relayed that information to Officer Price, who went to appellant's apartment on the third floor of the complex. Appellant's name was on a sign next to the apartment door.

Officer Price knocked on the door. Appellant responded and opened the door, stepping out of the apartment and onto the third floor landing. As he did so, he pulled the door shut behind him. Officer Price was not able to see into the apartment as appellant stepped out of it.

Officer Price noticed that appellant's breathing was labored, "like he had been through some exertion or something." He asked appellant for identification and whether he knew where his car was, explaining the circumstances and that he was looking for the person who had "bailed out" of the Caprice. Appellant responded that he did not know where his identification or his car were.

Just then, Corporal Joseph Yeater, Officer Price's superior, arrived at the first floor of the apartment complex. Officer Price and appellant walked down the steps to the first floor to meet Corporal Yeater and to await the arrival of Officer Gillespie, who had indicated that he was going to come by to

---

2. Although it was not addressed directly below, certain aspects of the testimony make plain that the driver was the only occupant of the Caprice.

look at appellant to determine if he was the driver of the Caprice. (After the events relevant to this appeal, it was established that appellant was not the driver of the Caprice and that he had had no involvement in the happenings that had precipitated the police visit to his apartment).

While the officers and appellant were awaiting Officer Gillespie's arrival, Officer Price once again raised the topic of identification. He and Corporal Yeater both asked appellant whether he had something in his apartment that would confirm his identity. Appellant responded by saying that he had a telephone bill in his apartment that he could show them. Appellant then walked back up the steps to the third floor of the apartment complex. Officer Price followed close behind him, with Corporal Yeater bringing up the rear.

Appellant approached his apartment, opened the door, and entered. Officer Price followed behind him, and Corporal Yeater followed Officer Price. Nothing was said—the officers did not ask permission to enter or tell appellant that they were about to enter, and appellant did not tell them not to enter. Officer Price testified that because he was responding to a call for "fleeing and eluding a police officer," he would not have let appellant out of his sight. He stated, however, that if appellant had told him not to enter the apartment, he would have complied. He further testified that when he and Corporal Yeater entered the apartment, appellant did not say or do anything to indicate that he objected to their presence.

As soon as Officer Price walked into appellant's apartment, he saw a gun on the coffee table, in plain view. He went over to examine it. Appellant told him that it was a cap or starter gun, not a real gun. At that point, Corporal Yeater noticed a "white chunk like" substance on the carpet around the coffee table in plain view. Both officers immediately recognized the substance to be crack cocaine. They placed appellant under arrest. The officers saw that the apartment had a bedroom and that the door to it was closed. They asked appellant for his consent to search that room, but received a negative response.

On the basis of their plain view observations of contraband in appellant's apartment, the police applied for and obtained a search warrant for all of the rooms in the apartment. Upon execution of the warrant, they found a .25 caliber semi-automatic pistol, ammunition, numerous white chunks of cocaine lying loosely about and in three baggies, and items of drug packaging paraphernalia. The cocaine recovered from appellant's apartment totaled 83.5 grams.

At the conclusion of the suppression hearing, the court made the following findings:

> While waiting on the first floor, the [officers] had additional conversation as to whether or not [appellant] could produce any type of identification. It was at that point that [appellant] mentioned that he thought he had a telephone bill with his name on it upstairs in his third floor apartment.

> [Appellant] then proceeded to go back up to his apartment with Officer Price following behind him. [Appellant] obviously knew that Officer Price was behind him as they climbed three flights of steps. Once they got to the apartment, [appellant] opened the door to his apartment and entered. At no time, as they were climbing steps or when they reached the door to the apartment did [appellant] ever tell Officer Price not to come on back up to the apartment or not to come into the apartment or make any objection whatsoever. There was no evidence that that occurred.

> \* \* \* \*

> So, I find that the consent, it was a consent search ... at no time did [appellant] object to the officer entering the apartment when he certainly had an opportunity to do so as they climbed the stairs to the apartment, for that matter, when they reached the apartment. So, I find that there was no violation of [appellant's] Fourth Amendment rights....

The court found, ultimately, that appellant had impliedly consented to the entry by the police officers into his apartment, and denied appellant's suppression motion on that basis.

## DISCUSSION

Appellant contends that the lower court's first-level factual findings do not support the constitutionally significant second-level factual finding of implied consent. He argues that the police entered his apartment without his consent, that the entry was not otherwise justified, and that the entry therefore constituted an unreasonable search, in violation of the Fourth Amendment. He further maintains that the evidence obtained in the subsequent warrant-based search of his apartment was tainted by the illegality of the prior warrantless search, and therefore should have been suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The State counters that the lower court properly found from the totality of the circumstances that appellant had consented, by his conduct, to the police officers' entry into his apartment. It argues that for that reason, the warrantless search was reasonable, and thus was not in violation of appellant's Fourth Amendment rights, and that the evidence found in plain view was seized legally. *Cf. Coolidge v. New Hampshire,* 403 U.S. 443, 466, n. 24, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)(stating that if entry into house is justified based on hot pursuit, and therefore is reasonable, then anything inadvertently in plain view can be seized legally). On that basis, the State maintains that the subsequent warrant-based search was not a product of a prior illegal search, the evidence obtained was not tainted, and the lower court correctly refused to suppress it.

■ The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Because a search of the house begins with the entry into it, physical entry into the house is considered a search. *Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436 (1948). *See also Arizona v. Hicks,* 480 U.S. 321, 324–35, 107 S.Ct. 1149, 94

L.Ed.2d 347 (1987)(holding that a search occurs whenever something not previously in plain view becomes exposed to investigating officer).

■■■■ The "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)(quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). "'At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusions.'" *Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)(quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *United States v. Gray,* 71 F.Supp.2d 1081, 1083 (D.Kan.1999).

■■■■ The Fourth Amendment requires that the government show that the police conduct in question was "objectively reasonable." *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *Illinois v. Rodriguez,* 497 U.S. 177, 183–84, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Warrantless searches, seizures, and arrests "'are *per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *McMillian v. State,* 325 Md. 272, 281, 600 A.2d 430 (1992)(quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). *See also Welsh v. Wisconsin, supra,* 466 U.S. at 749, 104 S.Ct. 2091 (It is a basic tenet of Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable.").

■■■■ The State bears the burden of proving the existence of an exception to the warrant requirement to justify, and thereby make reasonable, an otherwise presumptively unreasonable search. *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *State v. Bell,* 334 Md. 178, 191,

638 A.2d 107 (1994). Consent is one of those exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The State bears the burden of proving consent. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Doering v. State,* 313 Md. 384, 401, 545 A.2d 1281 (1988); *State v. Wilson,* 279 Md. 189, 201, 367 A.2d 1223 (1977)(consent must be proven by a preponderance of the evidence). This burden cannot be satisfied by showing nothing more than acquiescence to a claim of lawful authority. *Bumper v. North Carolina,* 391 U.S. 543, 548–50, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Whitman v. State,* 25 Md.App. 428, 456, 336 A.2d 515 (1975). For consent to be effective, it must have been freely and voluntarily given, and not have been the product of explicit or implied coercion. *Schneckloth,* 412 U.S. at 223, 228, 93 S.Ct. 2041; *Bumper v. North Carolina, supra.* Whether consent was voluntarily given is a question of fact to be determined "from the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041.

When we review the denial of a suppression motion that was based upon an alleged constitutional violation, we give deference to the factual findings of the lower court, unless they are clearly erroneous, but we exercise free review over the lower court's determination of the constitutional significance of those facts. *Cartnail v. State, supra,* 359 Md. at 282, 753 A.2d 519("If the Fourth Amendment is implicated by State action, [the appellate court] makes an independent determination of whether the State has violated an individual's constitutional rights by applying the law to the facts."); *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248 (1996); *see also Ornelas v. United States,* 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). With respect to second-level findings of fact, such as the voluntariness of a consent, Judge Moylan explained, in *Walker v. State,* 12 Md.App. 684, 280 A.2d 260 (1971):

> [W]hen we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is

involved [we mean] that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact—the existence or non-existence of voluntariness.

*Id.* at 695, 280 A.2d 260. *See also United States v. Rusher*, 966 F.2d 868, 873 (4th Cir.), *cert. denied*, 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992)(appellate court reviews legal conclusions relating to search and seizure issues *de novo* ); *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990)("When we are determining whether as a general rule certain types of actions give rise to an inference of consent, *de novo* review is appropriate.").

In the case *sub judice*, the first-level factual findings of the lower court were not clearly erroneous. Thus, on review, we accept them, but we exercise our independent judgment as to what to make of them, "resolving for ourselves the ultimate, second-level fact": whether appellant's conduct constituted an implied consent to the entry of the police into his apartment. *Walker, supra*, 12 Md.App. at 695, 280 A.2d 260.

Only three Maryland cases address what actions may properly be found to constitute implied consent to the entry of law enforcement officers into the home. In arguing that the lower court properly concluded that appellant impliedly consented to the police officers' entry into his apartment, the State relies heavily on *Chase v. State*, 120 Md.App. 141, 706 A.2d 613 (1998), the most recent case in the trilogy.

In *Chase*, the police knocked on the door to the defendant's house. When his wife answered, they asked her if the defendant was at home and told her that they needed to speak to him. She responded by "open[ing] the door wider and step[ping] out of the doorway," thereby allowing the officers to pass her and walk into the house. *Chase*, 120 Md.App. at 150,

706 A.2d 613. We affirmed the lower court's denial of a motion to suppress evidence that was found in the house, holding that by her gesture, the wife gave consent for the police to enter.

In holding as we did in *Chase*, we relied upon the Court of Appeals's opinion *In re Anthony F.*, 293 Md. 146, 442 A.2d 975 (1982). In that case, police officers went to the house in which the defendant and his sister lived and knocked on the door. When the sister answered, one of the officers requested permission to enter. The defendant's sister then "stepp[ed] back and open[ed] the door wide so they could enter." The Court held that the sister's conduct constituted consent to the entry. *In re Anthony F.*, 293 Md. at 147–48, 442 A.2d 975.

Three years before *In re Anthony F.* was decided, in the first case of the trilogy, the Court upheld the denial of a motion to suppress evidence, reasoning that the defendant had impliedly consented to the police entry into his house and the ensuing search. In *Lewis v. State*, 285 Md. 705, 404 A.2d 1073 (1979), the defendant came home to find his wife and child dead, apparently the victims of murder. He cooperated with the police during the initial phase of their investigation. When he started making preparations to leave the state to attend the victims' funerals, the police told him that, in his absence, they would need to enter his house to go through his papers and other such items. He did not agree, but did not express any objection. Thereafter, however, he "willingly arranged to leave his house key with a neighbor in order to give the police access to the premises" while he was away. *Lewis*, 285 Md. at 719, 404 A.2d 1073. The police used the key to enter the house. There they found a poem that he had written, incriminating himself. The police refocused their investigation, and eventually uncovered evidence that the defendant had hired a contract killer to murder his wife and child.

On appeal from convictions for accessory before the fact to first degree murder, solicitation to murder, and conspiracy to murder, the defendant argued, *inter alia*, that the police had

entered his house in violation of the Fourth Amendment. The Court of Appeals disagreed, noting that the defendant's conduct had risen to a level above mere acquiescence in the police officers' request to enter and search. Rather, he had "*affirmatively* made arrangements for the police to obtain a house key during his absence," thereby enabling them to enter the house and search it. *Id.* (Emphasis supplied.) The Court concluded that the circumstances were "sufficient to demonstrate that the search was freely and voluntarily consented to." *Id.*

The Fourth Circuit cases addressing implied consent, either to enter a suspect's house or to search his automobile or person, also are instructive.

In *United States v. Smith*, 30 F.3d 568 (4th Cir.), *cert. denied*, 513 U.S. 1028, 115 S.Ct. 604, 130 L.Ed.2d 514 (1994), the police were keeping a suspect under surveillance for suspected cocaine distribution. When they saw him walking toward his car, carrying a bag, they stopped him and asked whether they could search the bag. He said yes, and they searched it and found nothing. The police then asked the suspect whether they could search his car. He made no verbal response, but approached the car and unlocked it. The police searched the car and found cocaine. Upholding the lower court's denial of a motion to suppress the cocaine from evidence, the Fourth Circuit held that the suspect's act of unlocking his car door in response to the request by police to search it constituted an implied consent to search. *Smith*, 30 F.3d at 571.

In *United States v. Wilson*, 895 F.2d 168 (4th Cir.1990), a DEA agent posted at a Virginia airport observed the defendant deplaning from New York, and noticed that he was looking about nervously. The agent followed the defendant, identified himself, and engaged him in conversation about the DEA's effort to stop the flow of illegal drugs into the area from New York. When the agent asked the defendant if he could search his bag, the defendant replied, "Go ahead." The agent then asked the defendant whether he could search his

person. The defendant said nothing, but shrugged his shoulders and extended his hands in the air. The agent performed the pat-down search and detected a very hard substance in the defendant's groin area. The defendant was taken into custody and a body search revealed, *inter alia,* 131.5 grams of cocaine. The Fourth Circuit held that, under the totality of the circumstances, the defendant's act of responding to a request for permission to conduct a pat-down search by raising his arms in the air constituted an implied consent. 895 F.2d at 171; *see also United States v. Haynie,* 637 F.2d 227, 230 (4th Cir.1980)(defendant who voluntarily entered airport baggage screening area and presented himself to x-ray scanner operator impliedly consented to search); *United States v. DeAngelo,* 584 F.2d 46, 47 (4th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979)(passenger who voluntarily submitted his briefcase for x-ray examination at airport had impliedly consented to search).

In *Rice v. Warden,* 237 F.Supp. 463 (D.Md.1964), the defendant was arrested for armed robbery after a cohort implicated him. During interrogation, the defendant gave the police precise directions with which to find various guns belonging to the cohort that were in his (the defendant's) apartment. The court held that by detailing "clear, concise and explicit directions to the police both as to what to seek and where to seek it," the defendant impliedly consented to the police search of his apartment. *Rice,* 237 F.Supp. at 468.

By contrast, in *Karwicki v. United States,* 55 F.2d 225 (4th Cir.1932), the Fourth Circuit, reversing the defendant's conviction for possession of intoxicating liquors, held that his conduct had not amounted to consent to the police to enter his living quarters and search it. The defendant lived in several rooms that were next to a saloon and were connected to it by a hallway. Police officers came upon him in the saloon and told him that they had a complaint that whiskey and beer were being sold there. When the defendant denied that that was the case, the officer in charge replied, " 'Well, if there is no whiskey or beer here, you have no objection to our looking around.' " 55 F.2d at 225. The defendant did not say any-

thing in response. The officers proceeded to search the saloon, and found nothing. They then searched the rooms in which the defendant lived, and discovered whiskey.

The court held that the search had violated the defendant's Fourth Amendment rights, commenting,

[W]hen officers search without [a] warrant upon consent given by the owner of property, the consent must be unequivocal and specific, particularly when the premises searched may reasonably be held not to have been covered by the consent given. The fact that [the defendant] did not protest against the search of his living quarters is without significance. He was not required to protest.

*Id.* at 226; *see also United States v. McCraw,* 920 F.2d 224, 228 (4th Cir.1990)(holding that suspect's conduct in opening hotel room part way and then shutting it in response to police knock did not constitute implied consent to search); *Hall v. Warden, Maryland Penitentiary,* 313 F.2d 483, 494 (4th Cir.1963)(holding that defendant's actions in revealing to the police the location of his hotel and his room number and not expressly objecting to a search of his hotel room did not constitute consent to search hotel room).

To be sure, the Maryland and Fourth Circuit cases plainly establish that consent to search not only may be express, by words, but also may be implied, by conduct or gesture. *See also United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976)(holding that consent may be in the form of words, gesture, or conduct.). Yet, in all of these cases, the police made it known, either expressly or impliedly, that they wished to enter the defendant's house, or to conduct a search, and within that context, the conduct from which consent was inferred gained meaning as an unambiguous gesture of invitation or cooperation or as an affirmative act to make the premises accessible for entry. By contrast, in those Fourth Circuit cases in which the court concluded that the facts could not support a finding of implied consent, the law enforcement officers either did not ask for permission to enter or search, and thus did not make known their objective, or, if they did,

their request was met with no response or one that was nonspecific and ambiguous.

 In the instant case, the police did not ask appellant, directly or indirectly, for permission to enter his apartment. Appellant's act of walking up the steps and entering his apartment was not taken in response to a police request to enter, and therefore cannot be interpreted in that context. Even if by his awareness of the officers' presence immediately behind him for three flights of stairs appellant could sense, without any overt communication, that they wanted to enter the apartment with him, he made no gesture of invitation and took no affirmative act to let the officers in. He simply walked through the door without shutting it behind him, in response to the officers' request for identification.[3] Indeed, it was appellant's lack of action to bar the police from following him, not any overt or positive conduct on his part, that formed the basis for the lower court's finding of implied consent. Yet, the failure to tell the police to stay put or to close the door in their faces cannot be likened to a positive gesture of assent to invitation, or to an affirmative act taken to facilitate their entry. *See United States v. Gwinn*, 46 F.Supp.2d 479, 484 (S.D.W.Va.1999)(observing that Fourth Circuit cases finding implied consent are those "in which there was a specific request by police officers and a nonverbal affirmative response by an individual ... in which an individual took some affirmative act that directly exposed his or her property to inspection," or "in which there was a working relationship between police officers and a cooperating individual.").

---

**3.** We note that the lower court did not find that appellant invited the officers into his apartment by telling them that he had a telephone bill in his apartment that he could show them to confirm his identity. Such a finding would not have been supported by the evidence. The words did not constitute an invitation. Moreover, Officer Price testified that up to the point at which he entered appellant's apartment, he was willing to honor a request by appellant to remain outside. Officer Price would have had no reason to have been thinking along those lines had he regarded appellant's words as an invitation to accompany him into the apartment.

Cases from other federal circuits and state appellate courts have held that consent to enter may not be found in the mere act of walking through a door and leaving it open, and cannot be inferred from the absence of measures to bar police entry. In *United States v. Shaibu, supra,* 920 F.2d 1423, police detectives believed, incorrectly, that a suspect in a fraud investigation was living in Shaibu's apartment. The apartment was in a complex, to which access was controlled by an electronic front gate. The police went to the complex and buzzed Shaibu's apartment. A person answered and asked who was there. The police gave no response. The gate was buzzed opened, however, and the police entered the complex. They went to the apartment in question and found Shaibu standing outside, in the hallway. He had left the door to the apartment ajar. The officers started to question him, and one of them asked whether the person they were seeking was in his apartment. At that point, Shaibu turned around, walked to his apartment, and entered it. Without asking whether they could enter or telling him that they were going to do so, the police followed Shaibu inside. Once they were in the apartment, the police asked Shaibu for identification, which he gave them. They then asked whether they could "look around" to see if the man they were looking for was there. *Shaibu,* 920 F.2d at 1425. The defendant responded, "Sure, go ahead." *Id.* The police did not find the person they were seeking, but did find evidence of bank fraud, which resulted in Shaibu being charged.

The federal district court denied Shaibu's motion to suppress the evidence seized by the detectives in the search of his apartment, ruling that his failure to object to the detectives entering his apartment created an "implicit invitation" for them to enter and search it. *Id.* at 1425. The Ninth Circuit reversed, holding that Shaibu had not engaged in conduct sufficient to establish implied consent to enter. It contrasted the fact pattern before it with that in *United States v. Griffin, supra,* 530 F.2d 739. There, the Seventh Circuit held that Griffin's co-defendant impliedly consented to the police entering his apartment by responding to their request to enter by

stepping back into the apartment and leaving the door partially open (much as in *Chase v. State, supra,* 120 Md.App. 141, 706 A.2d 613 (1998)). The Ninth Circuit observed:

> It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police walking into a person's home without stopping at the door to ask permission.
>
> We do not expect others to walk into our homes, even if the door is open, without first requesting permission to enter. That the police would so enter, without request, creates an impression of authority to do so. . . . We interpret failure to object to the police officer's thrusting himself into Shaibu's apartment as more likely suggesting submission to authority than implied or voluntary consent. Even if there was not implicit coercion in fact here, the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. . . . We must not shift the burden of proof from the government—to show "unequivocal and specific" consent—to the Defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent.
>
> We hold that in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent.

*Shaibu, supra,* 920 F.2d at 1427–28. (Citations omitted).

In *United States v. Jaras,* 86 F.3d 383, 390 (5th Cir.1996), the court held that, in the absence of an express or implied request to search by the police, a defendant who stood by idly while an officer searched his luggage had not impliedly consented to the search. Likewise, in *United States v. Most,* 876 F.2d 191, 199 (D.C.Cir.1989), the court held that when there was no proof that police officers requested permission to search the defendant's bag, the conduct of store employees in cooperating with the officers could not amount to an implied

consent to search the bag. *See also United States v. Gonzalez,* 71 F.3d 819, 829 (11th Cir.1996)(homeowner's failure to bar "follow-on" entry of police into her residence did not constitute implied consent to enter); *compare United States v. Rosi,* 27 F.3d 409, 411 (9th Cir.1994)(holding defendant who was in custody following lawful arrest and who asked permission to change his clothes and gave police a key to his condominium consented to their entry into his condominium); *United States v. Garcia,* 997 F.2d 1273, 1281 (9th Cir.1993)(concluding that officers' request to talk to defendant, combined with defendant's affirmative response and act of stepping back to clear the way for officers' entry, was sufficient to infer consent); *United States v. Turbyfill,* 525 F.2d 57, 59 (8th Cir.1975)(holding that action of individual in opening door and stepping back in response to police request to enter constituted implied invitation to enter).

In *State v. DeCoteau,* 592 N.W.2d 579 (N.D.1999), police officers went to the defendant's house to investigate an anonymous report of a domestic disturbance. When the officers arrived, the defendant and his girlfriend were outside, unloading their car. Neither the defendant nor his girlfriend knew why the police were there, and the girlfriend told the officers she wanted them to leave. When the officers noticed a broken window, they told the girlfriend that the sound of breaking glass had been reported to them and they wanted to see whether the children inside the house were all right. The girlfriend entered the house, and the officers followed her. They saw a marijuana pipe in plain view. They proceeded to obtain a search warrant and to conduct a search of the residence, which revealed marijuana. Holding that the girlfriend's conduct did not amount to consent to enter, the court reasoned that a finding of implied consent required proof that the person who supposedly gave consent engaged in "affirmative conduct" consistent with the giving of consent, not merely that the person did nothing to stop the police from entering. *Id.* at 583 (citing *United States v. Jaras, supra,* 86 F.3d at 390; *Shaibu, supra,* 920 F.2d at 1427; *United States v. Wenzel,* 485 F.Supp. 481, 483 (D.Minn.1980)(failure to order uninvited offi-

cer to leave apartment is not enough to establish consent); *Robinson v. State*, 578 P.2d 141, 144 (Alaska 1978)(failure to demand that officers leave was not voluntary consent to their entry)).

In *State v. Johnson*, 177 Wis.2d 224, 501 N.W.2d 876 (App.1993), the Wisconsin Court of Appeals reversed the defendant's conviction because the evidence against him was derived from an illegal search. Officers patrolling an apartment building in a high crime area stopped and frisked the defendant and, finding no drugs or weapons, asked him to produce identification. He told them that it was in his girlfriend's apartment in the building. One of the officers then accompanied the defendant to the apartment. When the defendant went inside, the officer followed him. The officer "did not ask for Johnson's permission to enter, and Johnson did not ask him to come in." *Johnson*, 501 N.W.2d at 877. Rejecting the state's argument that, because there was no credible testimony that the defendant objected to the police entry, he impliedly consented to it, the court held that consent " 'cannot be found by a showing of mere acquiescence.' " *Id.* at 880 (quoting *Shaibu, supra*, 920 F.2d at 1426–27).

In *Walls v. Commonwealth of Virginia*, 2 Va.App. 639, 347 S.E.2d 175 (1986), police officers went to the defendant's trailer with a warrant for his arrest. When they knocked on the door, he answered and stepped outside, leaving the door open behind him. The defendant was placed under arrest outside of the trailer. Thereafter, one of the officers returned to the trailer, looked through the open door, and saw the defendant's fiancé. Without asking permission to enter, the officer entered the trailer and told the fiancé that the defendant had been arrested. He then asked her for permission to search the trailer, and she consented. The search revealed incriminating evidence. The Virginia appellate court rejected the Commonwealth's argument that the defendant's act of leaving the trailer door open behind him constituted an implied consent to the police entry. Noting that the prosecution "bears the burden of establishing consent and this burden is heavier where the alleged consent is based on an implica-

tion[,]" it held that "an open door does not, alone, constitute an invitation to enter." *Walls*, 347 S.E.2d at 178 (citing *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir.1984)). The court remarked that the defendant's failure to reach behind him and shut the door as he left could not be construed as an implied invitation to enter.

The court in *Walls* also concluded that the defendant's fiancé did not consent to the police entry into the trailer merely by standing in the room doing nothing, and that consent could not be inferred from the fact that she took no action to direct them to leave:

"When . . . police officers suddenly appear uninvited in one's apartment, one's initial reaction is shock, not an immediate order to leave."

If anything was being implied as [the police officer] walked through the door, it was that [the fiancé] had no choice whether or not he came in.

*Id.* at 179 (quoting *United States v. Wenzel, supra*, 485 F.Supp. at 483); *see also Banks v. Pepersack*, 244 F.Supp. 675, 680 (D.Md.1965)(holding that there was no implied consent when an occupant let police officers into the premises after they knocked on the door and flashed their badges).

In *People v. Baughman*, 47 Ill.App.3d 209, 5 Ill.Dec. 621, 361 N.E.2d 1149 (1977), officers went to the defendant's residence in response to a report that marijuana was being grown there. After finding marijuana in a barn on the property, they asked the defendant for permission to search his house. He said nothing. The police entered the house and found marijuana in an upstairs bedroom. In concluding that the lower court erred in denying the defendant's motion to suppress the evidence found in house, the court reasoned: "Although the defendant did not object to the officers entry of the house, he did not agree to it either. We are aware of no case holding that an individual's failure to object to the search of a building constitutes a tacit consent to the search." *Baughman*, 5 Ill.Dec. 621, 361 N.E.2d at 1149; *see also People v. Richardson*, 229 A.D.2d 316, 645 N.Y.S.2d 298, 299 (1996)

(holding that "[s]ince the officer never asked to enter the apartment, and no words were spoken, defendant's act of glancing over his shoulder [in response to the police officer's question if anything was wrong] cannot be construed as an invitation for the officer to enter."); *United States v. Gray, supra,* 71 F.Supp.2d at 1084 (D.Kan.1999)("The government may not show consent to enter solely from the defendant's failure to object to the entry.").

By contrast, in *People v. Gross,* 166 Ill.App.3d 413, 116 Ill.Dec. 828, 519 N.E.2d 1043 (1988), the defendant telephoned the police and the paramedics. The police arrived at his apartment, identified themselves, told him that there had been a shooting, and asked if anyone had run into his apartment. In response, the defendant opened the door, stepped out of the way, and walked over to the kitchen table, leaving the door open behind him. The court held that his actions constituted an implied consent for the police to enter into the apartment. (The court also held that the entry had been justified on the basis of exigence.)

■ The cases we have reviewed establish that, especially in the absence of a request by the police to enter, appellant's act of opening the door to his apartment and walking through it cannot give rise to a reasonable inference that he was giving the police permission to follow him. The police had asked appellant to produce an item that would help establish his identity, and in order to obtain it, he had to enter his apartment. It was for that reason that he opened the door to the apartment and walked inside. There was no evidence that in doing so he took any positive step or made any gesture that could be understood as an invitation to enter; the evidence showed only that he took the actions that were necessary to gain entry to the apartment himself. Indeed, Officer Price's acknowledgment that, up to the moment that he entered the apartment, he would have abided by a directive from appellant to remain outside, betrays any understanding on his part that appellant was implicitly consenting to entry. We find it telling that, knowing that there was no consensual subtext to appel-

lant's actions, Officer Price chose not to ask permission to enter, and instead slipped in behind him.

Appellant could not have prevented Officer Price and Corporal Yeater from following him up to his apartment door, and he was not required, at the risk of being deemed to have consented to their entry, to close the door in their faces or turn around and order them to stay in the hallway. In the words of the Ninth Circuit, to do so "would be to justify entry by consent and consent by entry," and would effectively relieve the government of the burden of proving consent. *Shaibu, supra,* 920 F.2d at 1427. So, too, the fact that appellant did not direct the officers to leave his apartment once they were inside did not make the illegal entry legal. The manner in which the police entered the apartment—without asking permission and following close on appellant's heels—must have telegraphed to him that they were entitled to be there. *See Walls, supra,* 347 S.E.2d at 179 (police officer's entry into residence without asking permission itself implied that officer was entitled to do so). Moreover, the entry and search were coextensive: the officers saw the contraband in plain view as soon as they entered the apartment.

Appellant's conduct did not amount to an implicit consent to the police to enter his apartment. Because the warrantless search of the apartment by the police was in violation of appellant's Fourth Amendment rights, and the evidence obtained thereafter was tainted by that violation, the lower court erred in denying appellant's motion to suppress evidence.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY BALTIMORE COUNTY.**